**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | **SECTION:** |
| | ) | |
| **v.** | ) | **JUDGE:** |
| | ) | |
| **HIS SYNDICATE 0033 @ LLOYD'S,** | ) | **MAGISTRATE JUDGE:** |
| **NAV SYNDICATE 1221 @ LLOYD'S,** | ) | |
| **PEM SYNDICATE 4000 @ LLOYD'S,** | ) | |
| **BRT SYNDICATE 2987 @ LLOYD'S,** | ) | |
| **AUL SYNDICATE 1274 @ LLOYD'S,** | ) | |
| **MARKEL INSURANCE COMPANY LTD.,** | ) | |
| **HDI GLOBAL SPECIALITY SE,** | ) | |
| **STAR STONE INSURANCE SE,** | ) | |
| **BAR SYNDICATE 1955 @ LLOYD'S,** | ) | |
| **NEO SYNDICATE 2468 @ LLOYD'S,** | ) | |
| **AXS SYNDICATE 1686 @ LLOYD'S,** | ) | |
| **INTERNATIONAL INSURANCE COMPANY** | ) | |
| **HANOVER SE,** | ) | |
| **QBE SYNDICATE 1036 @ LLOYD'S** | ) | |
| **ASPEN INSURANCE UK LTD.,** | ) | |
| **ACE EUROPEAN GROUP LTD.,** | ) | |
| **MLM SYNDICATE 1221 @ LLOYD'S** | ) | |
| **COF SYNDICATE 1036 @ LLOYD'S,** | ) | |
| **MKL SYNDICATE 3000 @ LLOYD'S,** | ) | |
| **TAL SYNDICATE 1183 @ LLOYD'S** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

The United States of America, acting at the request of the United States Coast Guard ("Coast Guard"), the United States Department of the Interior ("DOI"), and the National Atmospheric and Oceanographic Administration ("NOAA"), files this Complaint and alleges as follows:

1

## NATURE OF THE ACTION

1.     This is a civil action under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The case arises from an occurrence or series of occurrences beginning on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico and an offshore oil production platform located approximately ten miles off the coast of the State of Louisiana on the Outer Continental Shelf, owned and operated by Taylor Energy Company LLC ("Taylor Energy"), collapsed and sank, resulting in the discharge or substantial threat of discharge of oil, which continues to this day ("MC-20 Incident").  The platform, associated oil and gas wells, and related equipment ("MC-20 Facility") are located within tracts of land known as Mississippi Canyon Blocks 20 and 21 and South Pass Block 73 ("MC-20 Site"), which Taylor Energy leased from the DOI.

2.     Since the collapse and sinking of the Taylor Energy oil production platform in September 2004, oil has continued to be discharged into the Gulf of Mexico from the MC-20 Facility.  Since April 2019, using a containment system designed and installed after the Coast Guard partially federalized the oil spill response action, the Coast Guard has been collecting and removing oil discharging from the MC-20 Facility.

3.     The United States seeks repayment, pursuant to Sections 1016(f) and 1017(f)(2) of OPA, 33 U.S.C. §§ 2716(f) and 2717(f)(2), of over $128,367,063.57 in unrecovered removal costs and interest incurred by the Oil Spill Liability Trust Fund (the "Fund") in response to the MC-20 Incident up to the limit of their respective Certifications of Oil Spill Financial Responsibility ("OSFRs") from the following OPA guarantors of Taylor Energy: HIS Syndicate 0033 @ Lloyd's, NAV Syndicate 1221 @ Lloyd's, PEM Syndicate 4000 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, AUL Syndicate 1274 @ Lloyd's, Markel Insurance Company

Limited, HDI Global Specialty SE, Star Stone Insurance SE, Bar Syndicate 1955 @ Lloyd's,

NEO Syndicate 2468 @ Lloyd's, AXS Syndicate 1686 @ Lloyd's, International Insurance

Company Hanover SE, QBE Syndicate 1036 @ Lloyd's, Aspen Insurance UK Ltd., Ace

European Group Ltd., MLM Syndicate 1221 @ Lloyd's, COF Syndicate 1036 @ Lloyd's, MKL

Syndicate 3000 @ Lloyd's, and TAL Syndicate 1183 @ Lloyd's (collectively, "Defendants" or

"Guarantors").

4.      The United States also seeks a declaratory judgment on liability against the

Defendants up to the limit of their respective OSFRs, pursuant to the Declaratory Judgment Act,

28 U.S.C. § 2201(a), and OPA Sections 1005, 1015, 1016 and 1017(f)(2), 33 U.S.C. §§ 2705,

2715, 2716 and 2717(f)(2), for all removal costs and damages resulting from the MC-20

Incident, that will be binding on any subsequent action or actions to further recover removal

costs or damages, and interest resulting from the MC-20 Incident.

5.      With respect to natural resource damages, the United States seeks a declaratory

judgment under OPA Section 1017(f)(2), 33 U.S.C. § 2717(f)(2), that addresses only the

elements of liability under Section 1002(a) of OPA, 33 U.S.C. § 2702(a), that apply in common

with liability for removal costs and liability for natural resource damages.  The United States is

not seeking an award of natural resource damages in this action, nor is it seeking declaratory

judgment on what injury, destruction, or loss of natural resources has occurred as a result of the

unlawful discharge or substantial threat of discharge of oil.  Any such injury to, destruction of, or

loss of natural resources, and the damages that should be awarded therefore are reserved for

determination in a subsequent action or actions under Sections 1015(c) and 1017(f) of OPA, 33

U.S.C. §§ 2715(c), 2717(f).

## I.    JURISDICTION, AUTHORITY, AND VENUE

6.    This Court has jurisdiction over the subject matter of this action and over the parties pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as plaintiff), 33 U.S.C. § 2716(f) (OPA claims against guarantor), and 33 U.S.C. § 2717(b) (OPA jurisdiction and venue).

7.    Authority to bring this action is vested in the United States Department of Justice by, *inter alia*, 28 U.S.C. §§ 516 and 519.

8.    Venue in this District is proper pursuant to Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. § 1391, because the discharge or injury or damages occurred in this District; or the Defendants reside, may be found, have their principal offices, or have appointed an agent for service of process in this District, or because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District.

## II.    THE DEFENDANTS

9.    Defendants comprise the following entities, each of which provided OSFRs to DOI[1] pertaining to the MC-20 Facility: HIS Syndicate 0033 @ Lloyd's, NAV Syndicate 1221 @ Lloyd's, PEM Syndicate 4000 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, AUL Syndicate 1274 @ Lloyd's, Markel Insurance Company Limited, HDI Global Specialty SE, Star Stone Insurance SE, Bar Syndicate 1955 @ Lloyd's, NEO Syndicate 2468 @ Lloyd's, AXS Syndicate 1686 @ Lloyd's, QBE Syndicate 1036 @ Lloyd's, International Insurance Company Hanover

---

[1] Before October 2010, OSFRs were provided to DOI's Mineral Management Service ("MMS"). From October 2010 to October 2011, OSFRs were submitted to DOI's Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE), a successor agency to MMS. Beginning in October 2011, OSFRs were provided to DOI's Bureau of Ocean Energy Management ("BOEM"), a successor agency to BOEMRE.

SE, Aspen Insurance UK Ltd., Ace European Group Ltd., MLM Syndicate 1221 @ Lloyd's,

COF Syndicate 1036 @ Lloyd's,  MKL Syndicate 3000 @ Lloyd's, and TAL Syndicate 1183 @

Lloyd's.  In addition to providing OSFRs for the MC-20 Facility, Defendants each entered into

insurance agreements with Taylor Energy under the Insurance Code of the State of Louisiana

that were each procured by Burnett and Company, Inc., a licensed Louisiana surplus lines broker,

and signed in New Orleans, Louisiana, or procured by another licensed Louisiana broker.

### III.    STATUTORY AND REGULATORY BACKGROUND

#### A. Responsible Party Liability for Removal Costs and Damages under OPA

10.    OPA Section 1002(a), 33 U.S.C. § 2702(a), provides that "each responsible party

for . . . a facility from which oil is discharged, or which poses the substantial threat of a

discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the

removal costs and damages specified in subsection (b) [33 U.S.C. § 2702(b)] that result from

such incident."

11.    "Facility" means "any structure, group of structures, equipment, or device (other

than a vessel) which is used for one or more of the following purposes: exploring for, drilling

for, producing, storing, handling, transferring, processing, or transporting oil." 33 U.S.C.

§ 2701(9).

12.    OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), defines "responsible party"

to include, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which

the facility is located . . . [.]"

13.    OPA Section 1001(30), 33 U.S.C. § 2701(30), defines "remove" and "removal" to

mean "containment and removal of oil or a hazardous substance from water and shorelines or the

taking of other actions as may be necessary to minimize or mitigate damage to the public health

5

or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches[.]"

14.    OPA Section 1001(31), 33 U.S.C. § 2701(31), defines "removal costs" to mean "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident[.]"

15.    OPA Section 1001(14), 33 U.S.C. § 2701(14), defines "incident" to mean "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil."

16.    OPA Section 1001(7), 33 U.S.C. § 2701(7), defines "discharge" to mean "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

17.    OPA Section 1002(b)(1)(A), 33 U.S.C. § 2702(b)(1)(A), provides that the "removal costs" referred to in Section 1002(a) of OPA, 33 U.S.C. § 2702(a), include "all removal costs incurred by the United States . . . under subsection (c), (d), (e), or (*l*) of Section 1321 of this title [Section 311 of the Clean Water Act, 33 U.S.C. § 1321]."

18.    Pursuant to OPA Section 1017(f)(2), 33 U.S.C. § 2717(f)(2), in any action for recovery of removal costs referred to in OPA Section 1002(b)(1), 33 U.S.C. § 2702(b)(1), "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."

19.    OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), provides that the "damages" referred to in OPA Section 1002(a), 33 U.S.C. § 2702(a), include damages for injury to,

destruction of, or loss of use of, natural resources; damages for loss of subsistence use of natural resources; damages for injury to real or personal property, loss of profits and earning capacity; and damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares.

20.     OPA Section 1001(20), 33 U.S.C. § 2701(20), provides that "'natural resources' includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government."

21.     Under OPA Section 1006, 33 U.S.C. § 2706, liability for natural resource damages shall be to the United States and/or a State for natural resources belonging to, managed by, controlled by, or appertaining to the United States and/or a State.

### B. Guarantor Liability for United States Removal Costs and Damages

22.     OPA Section 1016(c) provides that a responsible party for an offshore facility must at any given point establish and maintain evidence of financial responsibility in the amount of $35 million, or up to $150 million, if the United States determines that a higher amount is justified based on the relative operational, environmental, human health, and other risks posed by the quantity or quality of oil that is explored for, drilled for, produced, or transported by the responsible party. 33 U.S.C. § 2716(c).

23.     OPA Section 1001(13) defines a "guarantor" to mean "any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under this Act." 33 U.S.C. § 2701(13).

24.     OPA Section 1016(f)(1) provides that "a claim for which liability may be established under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible party liable under that section for

7

removal costs and damages to which the claim pertains." 33 U.S.C. § 2716(f)(1). In defending against a claim under OPA Section 1016(f)(1), "the guarantor may invoke—(A) all rights and defenses which would be available to the responsible party under OPA; (B) any defense authorized under section 1016(e); and (C) the defense that the incident was caused by the willful misconduct of the responsible party. The guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor." 33 U.S.C. § 2716(f)(1). In a direct action under OPA Section 1016(f)(1), a guarantor's liability will be limited by the amount of financial responsibility provided by that guarantor on behalf of its responsible party. 33 U.S.C. § 2716(g).

25.     Although OPA Section 1016(f)(1) authorizes the DOI to promulgate regulations concerning, among other things, defenses to guarantor liability, the DOI has not authorized any additional defenses beyond those expressly stated in Section 1016(f)(1) of OPA. 30 C.F.R. § 553.41(a)(6).

26.     To implement OPA's financial responsibility provisions, DOI issued the Oil Spill Financial Responsibility for Offshore Facilities regulations. *See generally* 30 C.F.R. Part 553. These regulations provide, among other things, that, "(a) If you are a guarantor, then you are subject to direct action for any claim asserted by: (1) The United States for any compensation paid by the Fund under OPA, including compensation claim processing costs." 30 C.F.R. § 553.61(a). The DOI regulations state that "(a) Each instrument you submit as OSFR evidence must specify: . . . (2) That termination of the instrument will not affect the liability of the instrument issuer for claims arising from an incident (i.e. oil-spill discharge or substantial threat of the discharge of oil) that occurred on or before the effective date of termination." 30 C.F.R. § 553.41(a).

27.    The DOI regulations state that "(a) Each instrument you submit as OSFR evidence must specify: . . . (6) That the instrument issuer will not use any defenses against a claim made under OPA except: (i) The rights and defenses that would be available to a designated applicant or responsible party for whom the guaranty was provided; and (ii) The incident (i.e., oil-spill discharge or a substantial threat of the discharge of oil) leading to the claim for removal costs or damages was caused by willful misconduct of a responsible party for whom the designated applicant demonstrated OSFR."  30 C.F.R. § 553.41(a)(6).

28.    The DOI regulations require a designated applicant to submit to BOEM a demonstration of OSFR for each covered offshore facility for which it is the designated applicant, including completed and unaltered Form BOEM-1016 (Designated Applicant Information Certification), for insurance demonstrations, Form BOEM-1019 (Insurance Certificate), and Form BOEM-1021 (Covered Offshore Facilities).  30 C.F.R. § 553.40.

### C. Outer Continental Shelf Facility Owner/Operator Liability for United States Removal Costs Under OPA

29.    OPA Section 1004(c)(3), 33 U.S.C. § 2704(c)(3), provides, "Notwithstanding the limitations established under subsection (a) of this section [33 U.S.C. § 2704(a)] and the defenses of section 2703 of this title, all removal costs incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility or a vessel carrying oil as cargo from such a facility shall be borne by the owner or operator of such facility or vessel."

30.    OPA Section 1001(25), 33 U.S.C. § 2701(25), defines "Outer Continental Shelf facility" to mean "an offshore facility which is located, in whole or in part, on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for,

drilling for, producing, storing, handling, transferring, processing, or transporting oil produced

from the Outer Continental Shelf [.]"

## IV.    FACTUAL ALLEGATIONS

### A. History of the MC-20 Facility

31.     In 1981, Sohio Petroleum Corporation ("Sohio") purchased an oil and gas lease, OCS-G 04935, located on the Outer Continental Shelf in the Gulf of Mexico.  The OCS-G 04935 Lease granted Sohio the exclusive right and privilege to drill for, develop, and produce oil and gas resources in the submerged lands known as the MC-20 Block.

32.     In August 1984, Sohio completed construction of the oil production platform MC-20A.

33.     BP[2] later acquired and merged with Sohio in 1987.

34.     After its acquisition of Sohio and its interest in platform MC-20A, BP operated the MC-20 Facility and drilled 18 wells (A-1 through A-18) to develop and produce oil and gas from the facility.

35.     In 1994, BP sold the MC-20 Facility and transferred certain of its interests in the OCS-G04935 lease to Taylor Energy.

36.     After its acquisition of the MC-20 Facility, Taylor Energy continued the operation of the MC-20 Facility and drilled ten additional wells (A-19 through A-28) in 2000 and 2001.

37.     By September 2004, the MC-20 platform was connected to 28 oil and gas wells in the Gulf of Mexico Outer Continental Shelf.

---

[2] "BP" refers collectively to the following BP related entities: BP plc., BP Exploration & Production, Inc., and/or BP Exploration & Oil Inc.

### B. The MC-20 Incident

38.     Taylor Energy continued to operate and produce oil and gas from the MC-20 Facility until the platform toppled and oil production was halted when Hurricane Ivan passed through the Gulf of Mexico in September 2004.

39.     On or about September 16, 2004, the platform sank and the MC-20 Facility began discharging oil into the Gulf of Mexico.

40.     On September 17, 2004, the first oil sheen report relating to the MC-20 Facility was made to the Coast Guard's National Response Center following the damage to the MC-20 platform.

41.     By October 2004, a Unified Command structure was used to, *inter alia*, oversee and coordinate all response and mitigation efforts related to the MC-20 Incident.  The Unified Command included the Coast Guard as the Federal On-Scene Coordinator ("FOSC"), the Louisiana Oil Spill Coordinator's Office ("LOSCO") and Taylor Energy.

42.     In February 2005, Taylor Energy and the FOSC signed an Incident Action Plan and Taylor Energy retained Clean Gulf Associates to have assets on standby for shoreline protection.  Taylor Energy also retained Oceaneering International, Inc. and Fugro Chance, Inc. ("Furgo") to conduct a partial debris survey of the MC-20 Site.

43.     From March to May 2005, Taylor Energy conducted excavation activities to identify the well head locations at the MC-20 Site.  Operations were suspended after the survey results indicated that the well heads were located at depths beyond the reach of then existing technology.

44.     In 2006, Taylor Energy with C&C Technologies, Inc. conducted a survey of the MC-20 Site using sonar mapping.  The survey determined that the platform was approximately 550 feet downslope and southeast from its original location.

45.     In 2007 MMS ordered Taylor Energy to permanently plug and abandon all the wells at the MC-20 Site.  In addition, Taylor Energy employed Furgo to conduct additional excavation analysis at the MC-20 Site.

46.     In March 2008, the DOI and Taylor Energy entered into a Trust Agreement ("Decommissioning Trust") wherein Taylor Energy committed $666,280,000 to fulfill its decommissioning obligations under the Outer Continental Shelf Lands Act ("OCSLA") regarding the MC-20 Site.

47.     Pursuant to an April 2008 Environmental Assessment, MMS approved a departure that allowed Taylor Energy to fulfill its decommissioning obligations by drilling intervention wells rather than by conventional methods.

48.     On September 23, 2008, the FOSC issued Administrative Order ("Admin Order") 006-08, which required Taylor Energy to address the ongoing discharge of oil from the MC-20 Facility by, *inter alia*, deploying an open water skimmer to mitigate the continuous discharge at the MC-20 Facility until such time that pollution domes were installed; conducting overflights twice daily to monitor the discharge from the Facility; providing Coast Guard with the results of the overflights; and installing pollution domes to mitigate the continuous discharge by no later than November 1, 2008.

49.     By April 2009, Taylor Energy had installed a subsea oil recovery system at the MC-20 Facility.

50.     From 2009 to 2012, Taylor Energy's subsea containment system deteriorated, and oil continued to discharge from the MC-20 Facility into the Gulf of Mexico.

51.     By March 2011, Taylor Energy had drilled nine intervention wells at the MC20 Site.

52.     On June 25, 2012, the FOSC issued Admin Order 12-001, which required, *inter alia*, that Taylor Energy, by no later than September 1, 2012, begin the design and planning for a new pollution dome system suitable for the environmental conditions at the MC-20 Block and submit a written plan with/containing a projected timeline for fabrication and installation of the system to the Unified Command.

53.     On November 26, 2012, the FOSC amended Admin Order 12-001 to allow Taylor Energy to make repairs to its containment domes as an interim step in meeting the requirements of Admin Order 12-001.  Taylor Energy was given until January 30, 2013, to identify two companies that could design a new pollution dome system or make recommendations for the proper repair to its current system.

54.     In 2012, a NOAA vessel, the OKEANOS EXPLORER, conducted a survey of the MC-20 Site.  The survey showed a plume of oil rising from the seafloor near the MC-20 Facility's downed platform.

55.     Between 2012 and 2013, several governmental agencies, including the Coast Guard, the Bureau of Safety and Environmental Enforcement ("BSEE"), BOEM, and NOAA, and Taylor Energy continued to hold Unified Command meetings to evaluate site data, investigate ongoing oil discharges, and assess actions to contain and remove the oil.

56.     An Environmental Working Group, known as the Sheen Source Location Working Group ("SSLWG"), was established to address the source of sheening.

57.     The Unified Command also established a Well Review Working Group to assess each well associated with the MC-20 Facility for flow potential and risk analysis and agreed to conduct an Economic Risk Assessment.

58.     In a November 2017 report, the SSLWG determined that oil was being discharged from the same area identified by the OKEANOS EXPLORER survey: a deep erosional pit adjacent to the jacket (the structure that previously supported the production platform).

59.     In the fall of 2017, sonar surveys performed by a remotely operated vehicle ("ROV") for BSEE corroborated the SSLWG determination regarding the source of the oil discharge.

60.     In September 2018, NOAA scientists analyzing oil samples taken during a 2018 cruise concluded that that there is more than one leaking oil well with multiple oils entering the marine environment at depth and commingling to various degrees under different physical ocean current and surface conditions.

61.     On October 23, 2018, the FOSC issued Admin Order 19-001 to Taylor Energy, ordering it, *inter alia*, to institute a new containment system to capture, contain, and remove oil discharged from the MC-20 Facility.

62.     Admin Order 19-001 directed Taylor Energy to present at least two containment proposals at a November Unified Command meeting.  Following the Federal Procurement Integrity Act, the FOSC also solicited bids from contractors to design and build a new containment system.

63.     In November 2018, Taylor Energy presented two new containment domes to the Unified Command as a proposal to contain the MC-20 Incident and as a replacement for its

failed subsea containment system.  The FOSC, NOAA, and BSEE - making up a Technical Evaluation Team - also reviewed industry proposals for the new MC20 containment system.

64.    The FOSC and the Technical Evaluation Team rejected Taylor Energy's proposals because the FOSC's Technical Evaluation Team concluded, *inter alia*, that the proposed domes would have been insufficient in size or capacity to cover the affected area and would have resulted in: increased bottom disturbances, limited storage capacity, the necessity for a vessel to remain on-site for continuous processing and offloading of oil, and several hose connections that would introduce potential multiple failure points.

65.    The Couvillion Group LLC ("Couvillion") submitted a containment proposal in response to the Coast Guard's bid solicitation.  The FOSC adopted the Technical Evaluation Team's recommendation to select Couvillion's containment dome system.

66.    On November 16, 2018, the FOSC issued a Notice of Federal Assumption and assumed authority for containing the MC-20 Incident.

67.    In December 2018, the Coast Guard began working with Couvillion to design, construct, and install a new containment system to collect the oil that was discharging and continues to discharge from the MC-20 Facility. The FOSC accessed the Fund to pay for this work.

68.    As of August 2024, the Coast Guard, working with Couvillion, has collected more than 35,000 barrels or close to 1.5 million gallons of oil, and oil continues to discharge from the MC-20 Facility.

### C. Litigation Related to the MC-20 Incident
### Involving the United States and Taylor Energy

69.     On October 23, 2020, the United States filed a civil action against Taylor Energy

seeking repayment under Sections 1002(a), 1004(c)(3), and 1005 of OPA, 33 U.S.C. §§ 2702(a),

2704(c)(3), and 2705, of over $43 million in removal costs incurred as of that date and interest

then incurred by the Fund in response to the MC-20 Incident, a declaratory judgment on liability

for removal costs and damages, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a),

and OPA Sections 1002(a), 1004(c)(3), 1005, and 1017(f)(2), 33 U.S.C. §§ 2702(a), 2704(c)(3),

2705, and 2717(f)(2), and civil penalties and a declaratory judgment, under Sections 311(b)(7)

and 311(f) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1321(b)(7) and 1321(f).  *United*

*States v. Taylor Energy Company LLC*, C.A. No. 20-2910, (E.D. La. October 23, 2020)

(complaint).

70.     On March 17, 2022, the District Court for the Eastern District of Louisiana

approved a Consent Decree entered into by the United States and Taylor Energy that, subject to

certain conditions and reservations, resolved the United States' claims against Taylor Energy

arising from the MC-20 Incident.  Rec. Doc. 153.

71.     Under the Consent Decree, Taylor Energy has dismissed all of its pending

litigation against the United States, transferred approximately $432 million held in trust to the

DOI for use in decommissioning the MC-20 Facility, and paid the United States over $43.5

million, with $15,000,000 to a civil penalty, $16,500,000 to natural resources damages, and

$12,864,186 to the Coast Guard to reimburse a portion of its removal costs.  Further, Taylor

Energy agreed to transfer to the United States any excess surety funds, which later amounted to

$1,109,452.43.

72.     The Consent Decree expressly states that the "Consent Decree does not limit or affect the rights of [Taylor Energy], [Taylor Energy] Affiliated Entities, the United States, or the State against any third parties, not party to this Consent Decree."

### D. Federal Costs Incurred and Damages

73.     After the payment of $12,864,186 in removal costs by Taylor Energy and the $1,109,452.43 in excess surety bonds, the Fund has incurred more than $128,367,063.57 in unreimbursed removal costs and interest related to the MC-Incident.

74.     As a result of the MC-20 Incident, the United States has incurred and will continue to incur removal costs within the meaning of OPA, 33 U.S.C. § 2702(b).

75.     The ongoing discharge of oil from the MC-20 Facility is "in such quantities as may be harmful," within the meaning of the CWA, 33 U.S.C. § 1321(b)(3) and (b)(4).

76.     The amount of damages and the extent of injuries sustained by the United States as a result of the MC-20 Incident is not yet fully known.

### E. Defendants' Certifications of Oil Spill Financial Responsibility

77.     In September 2005, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $105 million for the periods from September 25, 2005, to December 25, 2005, and from January 1, 2006, to December 25, 2006, and subsequently for the period from September 25, 2005, to December 25, 2006, on behalf of Aspen Insurance UK Ltd., Ace European Group Ltd., MLM Syndicate 1221 @ Lloyd's, TAL Syndicate 1183 @ Lloyd's, HIS Syndicate 0033 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, and MKL Syndicate 3000 @ Lloyd's.

78.     On December 20, 2007, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $150 million for the period from December 25, 2007, to December 25, 2008, on behalf of Aspen

Insurance UK Ltd., Ace European Group Ltd., MLM Syndicate 1221 @ Lloyd's, COF Syndicate 1036 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, MKL Syndicate 3000 @ Lloyd's, and TAL Syndicate 1183 @ Lloyd's.

79.    On October 8, 2008, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $150 million for the period from September 1, 2008, to December 25, 2009, on behalf of Aspen Insurance UK Ltd., Ace European Group Ltd., MLM Syndicate 1221 @ Lloyd's, COF Syndicate 1036 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, MKL Syndicate 3000 @ Lloyd's, and TAL Syndicate 1183 @ Lloyd's.

80.    On December 11, 2009, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2009, to December 25, 2010, on behalf of QBE Syndicate 1036 @ Lloyd's.

81.    On December 14, 2010, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2010, to December 25, 2011, on behalf of QBE Syndicate 1036 @ Lloyd's.

82.    On December 22, 2011, Taylor Energy submitted MMS Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2011, to December 25, 2012, on behalf of QBE Syndicate 1036 at Lloyd's.

83.    On December 20, 2012, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of

$35 million for the period from December 25, 2012, to December 25, 2013, on behalf of QBE Syndicate 1036 @ Lloyd's.

84.    On December 20, 2013, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2013, to December 25, 2014, on behalf of QBE Syndicate 1036 at Lloyd's.

85.    On December 22, 2014, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2014, to December 25, 2015, on behalf of QBE Syndicate 1036 @ Lloyd's.

86.    On December 21, 2015, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2015, to December 25, 2016, on behalf of QBE Syndicate 1036 at Lloyd's.

87.    On December 20, 2016, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2016, to December 25, 2017, on behalf of QBE Syndicate 1036 @ Lloyd's.

88.    On December 20, 2017, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2017, to December 25, 2018, on behalf of QBE Syndicate 1036 at Lloyd's.

89.     On December 30, 2018, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from December 25, 2018, to December 25, 2019, on behalf of HIS Syndicate 0033 @ Lloyd's, NAV Syndicate 1221 @ Lloyd's, BAR Syndicate 1955 @ Lloyd's, PEM Syndicate 4000 @ Lloyd's, NEO Syndicate 2468 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, AUL Syndicate 1274 @ Lloyd's, Markel Int'l Ins. Co. Ltd., AXS Syndicate 1686 @ Lloyd's , and Int'l Ins. Co. of Hanover SE.

90.     On January 23, 2020, Taylor Energy submitted BOEM Forms 1016, 1019, and 1021 as evidence of financial responsibility pertaining to the MC-20 Facility in the amount of $35 million for the period from January 25, 2020 to January 25, 2021, on behalf of HDI Global Specialty SE, StarStone Insurance SE, HIS Syndicate 0033 @ Lloyd's, NAV Syndicate 1221 @ Lloyd's, PEM Syndicate 4000 @ Lloyd's, BRT Syndicate 2987 @ Lloyd's, AUL Syndicate 1274 @ Lloyd's, and Markel Int'l Ins. Co. Ltd.

91.     Each OSFR (Form 1019) contains a clause that states the guarantors agree that any suit or claim for removal costs or damages for which the insured may be liable under OPA may be brought directly against the named insurers for claims asserted by the United States Government.

92.      Each OSFR (Form 1019) contains a clause that states that the termination of the instrument will not affect the liability of the instrument issuer for claims arising from an incident (i.e. oil-spill discharge or substantial threat of the discharge of oil) that occurred on or before the effective date of termination.

93.     Each OSFR (Form 1019) contains a clause that states that the guarantors agree only to assert a defense that would be available to a responsible party under OPA, or that the incident leading to the claim was caused by the willful misconduct of the responsible party.

### F.     The Coast Guard's Removal Costs and Demands for Payment

94.     On April 20, 2020, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States to Upstream Brokers, which was listed as the insurance broker for the Defendants on the 2019 and 2020 OSFRs, stating that as of that date the Coast Guard had incurred $42,978,952.55 in unreimbursed removal costs.

95.     On May 18, 2020, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States to Mendes and Mount LLP, the representatives designated by the guarantors as agents for service of process in the 2019 and 2020 OSFRs, stating that as of that date the Coast Guard had incurred $42,978,952.55 in unreimbursed removal costs.

96.     On May 21, 2020, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States to the individual Lloyd syndicates listed in the 2019 and 2020 OSFRs, stating that as of that date the Coast Guard had incurred $42,978,952.55 in unreimbursed removal costs.

97.     On December 15, 2022, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Incident to the Lloyd's syndicates listed in the 2008 and 2009 OSFRs, for up to $150 million for the years 2008 and 2009, based on the OSFRs that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $88,524,100.38 in unreimbursed removal costs.

98.     Also, on December 15, 2022, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Incident to QBE for up to $35 million for the years from 2010 to 2018, based on the OSFRs that QBE had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $88,524,100.38 in unreimbursed removal costs.

99.     On the same date, the Coast Guard, on behalf of the Fund, also sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Incident to the Lloyd's syndicates listed in the 2019 and 2020 OSFRs, for up to $35 million for the years 2019 and 2020, based on the OSFRs that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $88,524,100.38 in unreimbursed removal costs.

100.    On November 17, 2023, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Incident to the Lloyd's syndicates listed in the 2008 and 2009 OSFRs, for up to $150 million for the years 2008 and 2009, based on the OSFRs that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $128,367,063.57 in unreimbursed removal costs.

101.    On November 17, 2023, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Incident to QBE for up to $35 million for the years from 2010 to 2018 based on the OSFRs that QBE had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $128,367,063.57 in unreimbursed removal costs.

102.    On November 17, 2023, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Facility to the Lloyd's syndicates listed in the 2019 and 2020 OSFRs, for up to $35 million for the years 2019 and 2020, based on the OSFRs that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $128,367,063.57 in unreimbursed removal costs.

103.    On February 28, 2024, the Coast Guard, on behalf of the Fund, sent a written request for reimbursement of removal costs incurred by the United States related to the MC-20 Facility to the Lloyd's syndicates listed in the September 25, 2005, to December 25, 2005, and the January 1, 2006, to December 25, 2006 OSFRs, for up to $105 million, based on the OSFRs that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $128,367,063.57 in unreimbursed removal costs.

104.    On June 4, 2024, the Coast Guard, on behalf of the Fund, sent a notice of rescission of the request for reimbursement of removal costs related to the September 25, 2005, to December 25, 2005, and the January 1, 2006, to December 25, 2006, OSFRs; and sent a request for reimbursement of removal costs incurred by the United States related to the MC-20 Facility to the Loyd's syndicates listed in the September 25, 2005, to December 25, 2006, OSFR for up to $105 million, based on the OSFR that the Guarantors had provided related to the MC-20 Facility, stating that as of that date the Coast Guard had incurred $128,367,063.57 in unreimbursed removal costs.

105.    None of the Defendants have paid the Coast Guard for any of the removal costs and interest incurred by the United States in connection with the MC-20 Incident and demanded by the Coast Guard on behalf of the Fund.

## V.    <u>LEGAL CONTENTIONS SUPPORTING CLAIMS FOR RELIEF</u>

106.    Each Defendant is a "person" within the meaning of OPA Section 1001(27), 33 U.S.C. § 2701(27).

107.    Each Defendant is a "guarantor," within the meaning of OPA Section 1001(13), 33 U.S.C. § 2701(13).

108.    The MC-20 Facility is a "facility" within the meaning of OPA Section 1001(9), 33 U.S.C. § 2701(9).

109.    The MC-20 Facility is an "offshore facility" within the meaning of OPA Section 1001(22), 33 U.S.C. § 2701(22)).

110.    The MC-20 Facility is a "covered offshore facility" within the meaning of DOI regulations, 30 C.F.R. § 553.3.

111.    The MC-20 Facility is an "Outer Continental Shelf Facility" within the meaning of OPA Section 1001(25), 33 U.S.C. § 2701(25).

112.    At all material times herein, Taylor Energy was the "owner or operator" of the MC-20 Facility within the meaning of OPA Section 1001(26)(A)(ii), 33 U.S.C. § 2701(26)(A)(ii) and CWA Section 311(a)(6), 33 U.S.C. § 1321(a)(6).

113.    At all material times herein, Taylor Energy was a "lessee" or "permittee," within the meaning of OPA Sections 1001(16) or (28), 33 U.S.C. § 2701(16) or (28), of the MC-20 Block.

114.    Taylor Energy is a "responsible party" within the meaning of OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C).

115.    The discharge of oil into the Gulf of Mexico is a "discharge" of "oil" into "navigable waters" as those terms are defined in OPA Section 1001(7), 33 U.S.C. § 2701(7)

("discharge"); OPA Section 1001(23), 33 U.S.C. § 2701(23) ("oil"); and OPA Section 1001(21), 33 U.S.C. § 2701(21) ("navigable waters").

116.    The Coast Guard undertook "removal" actions within the meaning of OPA Section 1001(30), 33 U.S.C. § 2701(30).

117.    The occurrence or series of occurrences, which began on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico, collapsed and sank the MC-20 platform, which was owned and operated by Taylor Energy, resulting in the discharge or substantial threat of discharge of oil that continues to the present is an "incident" within the meaning of OPA Section 1001(14), 33 U.S.C. § 2701(14).  This series of occurrences includes, among other things, Taylor Energy's failure to effectively decommission the MC-20 Facility wells or otherwise stop the ongoing discharges of oil or substantial threat thereof.

118.    The costs incurred by the Fund for the Coast Guard's removal action conducted in response to the release of oil from the MC-20 Facility are "removal costs" within the meaning of OPA Sections 1001(31) and 1002(b)(1), 33 U.S.C. §§ 2701(31) and 2702(b)(1).

119.    The Fund may incur costs for "damages," within the meaning of OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources (including the costs of assessing the damage), damages for injury to real or personal property, loss of profits and earning capacity, loss of subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources.

## VI.    FIRST CLAIM FOR RELIEF
## DEFENDANTS ARE LIABLE UNDER OPA FOR REMOVAL COSTS

120.    The United States re-alleges Paragraphs 1-119 above as if fully set forth herein.

121.    Each Defendant is "guarantor" for Taylor Energy within the meaning of OPA Sections 1001(13) and 1016, 33 U.S.C. §§ 2701 and 2716.

122.    Each Defendant has provided evidence of financial responsibility for Taylor Energy, as the responsible party, for the MC-20 Incident under OPA Sections 1016, 33 U.S.C. § 2716.

123.    Each Defendant is directly liable to the United States for all removal costs incurred by the United States resulting from the MC-20 Incident and interest up to the amount of financial responsibility provided under OPA Section 1005 and 1016, 33 U.S.C. §§ 2705 and 27165, since a claim for liability may be established against Taylor Energy as a responsible party under OPA Section 1002.  33 U.S.C. § 2702.

## VII.    SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT THAT DEFENDANTS ARE LIABLE FOR FUTURE REMOVAL COSTS AND DAMAGES

124.    The United States re-alleges Paragraphs 1-119 above as if fully set forth herein.

125.    Each Defendant is a "guarantor" for Taylor Energy within the meaning of OPA Sections 1001(13) and 1016, 33 U.S.C. §§ 2701 and 2716.

126.    Each Defendant has provided evidence of financial responsibility for Taylor Energy, as a responsible party, for the MC-20 Incident under OPA Sections 1016, 33 U.S.C. § 2716.

127.    Each Defendant is directly liable to the United States for all removal costs and damages incurred by the United States resulting from the MC-20 Incident and interest up to the amount of its financial responsibility provided under OPA Section 1005 and 1016, 33 U.S.C. §§

2705 and 2716, since a claim for liability may be established against Taylor Energy as a responsible party under OPA Section 1002. 33 U.S.C. § 2702.

128.    The Fund may pay costs incurred or to be incurred for "damages" resulting from the MC-20 Incident as that term is defined in 33 U.S.C. § 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources (including the costs of assessing the damage), damages for injury to real or personal property, loss of profits and earning capacity, loss of subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources. OPA Section 1012(a)(2); 33 U.S.C. §2712(a)(2).

129.    An actual controversy exists between the United States and the Defendants.

130.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA Sections 1016 and 1017(f)(2), 33 U.S.C. §§ 2716 and 2717(f)(2), the United States is entitled to a declaratory judgment that the Defendants are liable up to the amount of their financial responsibility for all removal costs and damages resulting from the MC-20 Incident, and that will be binding on any subsequent action or actions to further recover removal costs or damages.

131.    With respect to natural resource damages, the declaratory judgment to which the United States is entitled under Section 1017(f)(2) of OPA, 33 U.S.C. § 2717(f)(2), as described in the immediately prior paragraph, is a declaratory judgment on the elements of liability for removal costs that also applies to Defendants' liability for natural resource damages. This partial declaratory judgment would not address what injury, destruction, loss of, or loss of use of, natural resources has occurred resulting from the MC-20 Incident. Any such injury to, destruction of, loss of, or loss of use of, natural resources and the damages that should be awarded are reserved for determination in a subsequent action or actions.

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.      Award the United States $128,367,063.57 in removal costs and accrued interest, plus all other removal costs incurred by the United States and interest thereon through the date of judgment;

B.      Enter a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA Sections 1005, 1015, 1016 and 1017(f)(2), 33 U.S.C. §§ 2705, 2715, 2716 and 2717(f)(2), that the Defendants are liable up to the amount of their financial responsibility for all removal costs and damages resulting from the MC-20 Incident, and that will be binding on any subsequent action or actions to further recover removal costs or damages.

C.      Award the United States its costs of this action; and

D.      Grant such other relief as the Court deems just and proper.


                                        Respectfully submitted,


Dated: November 26, 2024                TODD KIM
                                        Assistant Attorney General
                                        Environment and Natural Resources Division
                                        United States Department of Justice
                                        Washington, D.C.

                                        /s/ Richard Gladstein
                                        RICHARD GLADSTEIN (D.C. Bar # 362404)
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        Environmental Enforcement Section
                                        P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        Telephone: (202) 514-3211
                                        Richard.gladstein@usdoj.gov

OF COUNSEL:

THOMAS H. VAN HORN
PATRICIA KINGCADE
DAVID DUBAY
Attorney Advisors
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

HEATHER S. KENNEALY
Attorney Advisor
U.S. Coast Guard Headquarters
Office of Claims and Litigation (CG-LCL)
2703 Martin Luther King Jr. Avenue, SE, Stop 7213
Washington, DC 20593-7213

ANNE S. WITHERUP
Attorney-Advisor
Natural Resources Section
NOAA Office of General Counsel
263 13th Avenue South, Suite 177
St. Petersburg, FL 33701

JOHN RUDOLPH
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife,
Branch of Environmental Restoration
1849 C Street, NW, MS-6560 MIB
Washington DC 20240