# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-02767 |
| | ) | |
| HIS SYNDICATE 0033 @ LLOYD'S, NAV SYNDICATE 1221 @ LLOYD'S, PEM SYNDICATE 4000   @ LLOYD'S. BRT SYNDICATE 2987 @ LLOYD'S, AUL SYNDICATE 1274 @ LLOYD'S, MARKEL INSURANCE COMPANY LTD., HDI GLOBAL SPECIALITY SE, STAR STONE INSURANCE SE, BAR SYNDICATE 1955 @ LLOYD'S, NEO SYNDICATE 2468 @ LLOYD'S, AXS SYNDICATE 1686 @ LLOYD'S, INTERNATIONAL INSURANCE COMPANY HANOVER SE, QBE SYNDICATE 1036 @ LLOYD'S, ASPEN INSURANCE UK LTD., ACE EUROPEAN GROUP LTD., MLM SYNDICATE 1221 @ LLOYD'S, COF SYNDICATE 1036 @ LLOYD'S, MKL SYNDICATE 3000 @ LLOYD'S, TAL SYNDICATE 1183 @ LLOYD'S, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF UNDERWRITERS' MOTION TO DISMISS

153557076.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE CASE .............................................................................................. 4

      A.      Legal Background ........................................................................................ 4

      B.      Factual Background ..................................................................................... 7

SUMMARY OF ARGUMENT ............................................................................................. 10

LEGAL STANDARD ........................................................................................................ 12

ARGUMENT .................................................................................................................... 12

I.        The Oil Pollution Act Does Not Authorize The Government To Obtain Any Recovery From Underwriters Related To The MC-20 Incident. ..................................... 12

      A.      Underwriters Were Not The Guarantors That Provided Evidence of Financial Responsibility for Taylor Energy at the Time of the MC-20 Incident. ..................................................................................................... 12

      B.      The Government's Theory of Guarantor Liability Is Meritless. ........................... 19

II.      The Government's Consent Decree With Taylor Energy Precludes The Government From Obtaining A Double Recovery From Post-2004 Guarantors .............. 22

CONCLUSION ................................................................................................................ 24

CERTIFICATE OF SERVICE

153557076.1

# TABLE OF AUTHORITIES

**Cases**

*Akula v. Cassidy,*
  2024 WL 1556534 (E.D. La. Apr. 10, 2024) ............................................................... 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................................................................... 12

*Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.,*
  987 F.2d 415 (7th Cir. 1993) ......................................................................................... 14

*BITCO Gen. Ins. Corp. v. Acadia Ins. Co.,*
  427 F.Supp.3d 838 (E.D. Tex. 2019) ............................................................................. 14

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.,*
  49 F.4th 520 (5th Cir. 2022) .......................................................................................... 12

*CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.,*
  589 U.S. 348 (2020) ................................................................................................... 4, 16

*Corley v. United States,*
  556 U.S. 303 (2009) ....................................................................................................... 20

*Franklin v. Fugro-McClelland (Sw.), Inc.,*
  16 F.Supp.2d 732 (S.D. Tex. 1997) ............................................................................... 14

*Golnay Barge Co., Inc. v. M/T SHINOUSSA,*
  3 F.3d 439 (5th Cir. 1993) ........................................................................................ 19, 21

*In re Great Lakes Dredge & Dock Co. LLC,*
  624 F.3d 201 (5th Cir. 2010) ......................................................................................... 12

*Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.,*
  997 F.2d 172 (6th Cir. 1993) ......................................................................................... 15

*Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.,*
  652 F.3d 584 (5th Cir. 2011) ........................................................................................... 6

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) .................................................................................................. 11, 15

*Lowery v. Fid. Nat'l Prop. & Cas. Ins. Co.,*
  805 F.3d 204 (5th Cir. 2010) ......................................................................................... 24

*Mason Drug Co., Inc. v. Harris,*
  597 F.2d 886 (5th Cir. 1979) ......................................................................................... 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007)..................................................................................................16

*QBE Underwriting Ltd. v. Taylor Energy Co., LLC*,
   2023 WL 7280522 (E.D. La. Nov. 3, 2023)..............................................................8

*Rice v. Harken Expl. Co.*,
   250 F.3d 264 (5th Cir. 2001)......................................................................................5

*Rick Franklin Corp. v. DHS*,
   2008 WL 337978 (D. Or. Feb. 4, 2008)...................................................................18

*Sekhar v. United States*,
   570 U.S. 729 (2013)............................................................................................15, 21

*Taylor Energy Co. LLC v. Underwriters at Lloyd's*,
   2010 WL 4553482 (E.D. La. Oct. 29, 2010).........................................................8, 19

*Taylor Energy Co. LLC v. United States*,
   2020 WL 6075693 (D.D.C. Oct. 14, 2020)................................................................9

*United States v. ERR, LLC*,
   35 F.4th 405 (5th Cir. 2022).......................................................................................4

*United States v. Taylor Energy Co. LLC*,
   No. 20-cv-2910 (E.D. La. filed October 23, 2020)....................................................9

*United States v. Texas*,
   507 U.S. 529 (1993)..................................................................................................15

*Water Quality Ins. Syndicate v. United States*,
   522 F.Supp.2d 220 (D.D.C. 2007) ......................................................................13, 20

**Statutes**

26 U.S.C. §4611 .............................................................................................................18

26 U.S.C. §4611(d) ..........................................................................................................6

33 U.S.C. §1321(c)-(e)....................................................................................................5

33 U.S.C. §1321(*l*)..........................................................................................................5

33 U.S.C. §2701(7) .....................................................................................................4, 20

33 U.S.C. §2701(13) ........................................................................................................6

33 U.S.C. §2701(14) .................................................................................................4, 13, 20

33 U.S.C. §2701(19) ................................................................................................. 5

33 U.S.C. §2701(32)(c) ............................................................................................ 4

33 U.S.C. §2702 ....................................................................................................... 6

33 U.S.C. §2702(a) ........................................................................................ 4, 13, 22

33 U.S.C. §2702(b) ................................................................................................. 13

33 U.S.C. §2702(b)(1) .............................................................................................. 5

33 U.S.C. §2702(b)(2) .............................................................................................. 5

33 U.S.C. §2703 ....................................................................................................... 4

33 U.S.C. §2704 ....................................................................................................... 4

33 U.S.C. §2704(a)(3) .............................................................................................. 5

33 U.S.C. §2704(d)(4) .............................................................................................. 5

33 U.S.C. §2712 ....................................................................................................... 6

33 U.S.C. §2712(a)(4) ............................................................................................. 18

33 U.S.C. §2713 ..................................................................................................... 18

33 U.S.C. §2713(a) ................................................................................................... 6

33 U.S.C. §2716 ..................................................................................................... 17

33 U.S.C. §2716(c)(1) ................................................................................... 5, 14, 17

33 U.S.C. §2716(e) ........................................................................................... 5, 15

33 U.S.C. §2716(f) ....................................................................................... 19, 22, 23

33 U.S.C. §2716(f)(1) ................................................................................... 7, 13, 14

33 U.S.C. §2716(f)(1)-(2) ......................................................................................... 6

33 U.S.C. §2716(g) ................................................................................................... 7

**Regulations**

30 C.F.R. §553.20(b) ............................................................................................. 15

30 C.F.R. §553.29 .................................................................................................. 15

30 C.F.R. §553.29(b)(2) ............................................................................................ 15

30 C.F.R. §553.41(a) ................................................................................................ 21

30 C.F.R. §553.41(a)(1) ............................................................................. 6, 7, 15, 22

30 C.F.R. §553.41(a)(2) .............................................................................................. 6

30 C.F.R. §553.41(a)(3) ............................................................................................ 22

30 C.F.R. §553.702 ..................................................................................................... 5

33 C.F.R. §135.207(c) (1990) ................................................................................... 16

61 Fed. Reg. 9,264 (Mar. 7, 1996) ........................................................................... 17

63 Fed. Reg. 42,699 (Aug. 11, 1998) ....................................................................... 16

**Other Authorities**

Black's Law Dictionary (6th ed. 1990) ...................................................................... 14

Consent Decree, *United States v. Taylor Energy Co. LLC*,
   No. 20-cv-2910 (E.D. La. filed Mar. 17, 2022) ........................................... 9, 10, 23

Exec. Order No. 14,172 (Jan. 20, 2025) ..................................................................... 8

Darryl Fears, *A 14-Year-Long Oil Spill in the Gulf of Mexico Verges on Becoming
   One of the Worst in U.S. History*, Wash. Post (Oct. 21, 2018),
   https://rebrand.ly/9iaq7qf .................................................................................... 9

H.R. Rep. No. 101-653 (1990) ............................................................................... 5, 16

Douglas Laycock & Richard L. Hasen, *Modern American Remedies*
   (5th ed. 2019) ...................................................................................................... 24

Nat'l Oceanic and Atmospheric Admin., *An Integrated Assessment of Oil and Gas
   Release into the Marine Environment at the Former Taylor Energy MC20 Site*
   (Andrew L. Mason et al. eds., 2019), https://rebrand.ly/kl83oi4 .......................... 8

Restatement (Second) of Judgments (1982) .............................................................. 24

Treasury Dep't, Bureau of the Fiscal Serv., *Oil Spill Liability Trust Fund 70X8185
   FY 2024 Investment Reporting* (Sept. 30, 2024), https://tinyurl.com/nhd5t427 ...... 6

Underwriters, as more specifically defined in the Motion to Dismiss the Complaint, respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Complaint filed by the United States.

## INTRODUCTION

This lawsuit—filed by the government during the last days of the Biden Administration—involves an extraordinary government overreach that ignores plain text and basic principles of the insurance industry while threatening to paralyze the U.S. oil industry by eliminating a critical insurance market on which it depends. The Oil Pollution Act of 1990 (OPA) provides that an owner or operator of an offshore facility or vessel—referred to as a "responsible party" under the statute—is generally subject to strict liability whenever there is an "incident" involving the facility or vessel that results in an oil spill. Because "incidents" can include natural phenomena like hurricanes beyond the power of responsible parties (or anyone else) to control, the responsible parties' potential OPA liability is daunting. Indeed, they generally face unlimited liability for all "removal costs" associated with the oil spill, including costs incurred by the government, and up to $168 million in additional liability for "damages."

To ensure that responsible parties are actually able to cover at least some of this potentially massive liability for an incident when disaster strikes, the OPA mandates that they maintain "evidence of financial responsibility," which may take the form of insurer-issued guarantees, self-insurance, surety bonds, or indemnities. For offshore facilities, evidence of financial responsibility is required in an amount between $35 million and $150 million. The parties providing this evidence of financial responsibility are known as "guarantors," and when the guarantors are insurers, they operate like insurers in any other context and thus issue policies offering coverage for particular time periods, which generally last one year. Those policies are then evidenced to the government through an Oil Spill Financial Responsibility document—known as an OSFR—and

153557076.1

decades-old regulations implementing the OPA specifically require responsible parties to inform the government of the "effective date" and "expiration date" of each insurance policy to eliminate any confusion about which insurer is supplying evidence of financial responsibility at any given time. Then, if an incident occurs during a particular coverage period, the government knows which guarantor has provided coverage.

This case concerns an incident that occurred in September 2004, when Hurricane Ivan tore through the Gulf. As relevant here, the hurricane produced a massive, catastrophic seafloor collapse that toppled an offshore facility—the Mississippi Canyon Block 20 facility (MC-20 Facility)—owned by Taylor Energy Company LLC (Taylor Energy), which in turn caused MC-20 Facility wells to begin discharging oil into the Gulf. Fortunately, the OPA's liability scheme worked exactly as intended in the wake of this incident (MC-20 Incident). The insurer that provided Taylor Energy with OPA coverage in 2004 made a full payment of $35 million, and after exhausting that policy's coverage limits, Taylor Energy contributed hundreds of millions of dollars of its own money for cleanup costs for nearly 15 years thereafter.

Recently, however, the government assumed control over the continuing cleanup efforts—and those costs spiraled. Indeed, over the last several years, the government has incurred well over $100 million in removal costs. In an effort to recoup those costs, the government began in the logical place and sued Taylor Energy, demanding reimbursement. That lawsuit ended with a consent decree providing (among other things) that Taylor Energy would make substantial payments and transfer control over a $432 million trust to the government in exchange for a release of liability. Apparently unsatisfied with those remarkable sums, the government has turned to Taylor Energy's guarantors. To be clear, the government did not target the insurer that provided coverage to Taylor Energy during the relevant policy period for the 2004 incident for the rather

153557076.1 2

obvious reason that it had already lived up to its end of the bargain and fully paid out its $35 million in OPA coverage. Instead, the government targeted insurers (like Underwriters here) that served as guarantors for Taylor Energy *between 2005 and 2021*. When Underwriters declined to pay for the rather obvious reason that they never agreed to provide coverage for the year during which the MC-20 Incident occurred, the government filed this lawsuit.

This lawsuit is government overreach, pure and simple. Both the OPA and basic principles of insurance plainly do not require guarantors to pay for past incidents that predated their coverage periods. Indeed, embracing the government's unprecedented theory of liability would effectively destroy the market for oil-spill insurance that the OPA sought to foster. After all, Taylor Energy continued to operate other facilities after 2004 that needed guarantees of financial responsibility. But no insurer would ever provide that insurance if, by doing so, it automatically became liable for an incident that had already occurred. That is just not how insurance works, and the government's short-sighted efforts to make the defendants here pay for ongoing cleanup efforts will destroy Congress' scheme. Offshore facilities and vessels alike are statutorily required to maintain evidence of financial responsibility to continue operating, but no rational insurer will participate in this market if it is on the hook for oil-spill-producing incidents that have already taken place (unless they charge premiums that equal their potential liability). All that suffices to dispose of this case, but there is more, as the government's consent decree with Taylor Energy independently forecloses this lawsuit too. For any and all of these reasons, this Court should put an end to the government's effort to extract hundreds of millions of dollars from parties that do not owe it a cent.

## STATEMENT OF THE CASE

### A.    Legal Background

Following the Exxon-Valdez oil spill, which occurred in 1989, Congress passed and President George H.W. Bush signed the OPA in 1990 "to promote the prompt cleanup of oil spills." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. 348, 353 (2020). To that end, the OPA imposes "strict liability" on certain parties—known as "responsible parties"—for oil-spill cleanups when certain conditions are met. *United States v. ERR, LLC*, 35 F.4th 405, 408 (5th Cir. 2022). More precisely, §2702 of the OPA states that, unless an enumerated defense applies, "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages ... that result from such incident." 33 U.S.C. §2702(a); *see also* §2703 (listing defenses to liability).

As that language demonstrates, the default rule under the OPA is that a responsible party is automatically liable for removal costs and damages in the event of an "incident" that results in the "discharge[]" of oil. Those two terms are expressly and separately defined in the OPA. An "incident" is "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." *Id.* §2701(14). And "discharge" means "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping." *Id.* §2701(7).

If OPA liability is triggered, the exposure of a responsible party can be devastating. This case implicates an offshore facility, and the responsible party in that context is "the lessee or permittee of the area in which the facility is located," which here is Taylor Energy. *Id.* §§2701(32)(c), 2704. Among other things, the OPA and its implementing regulations state that,

153557076.1 4

"with respect to each incident," the responsible party's liability for removal costs is potentially limitless, as it is liable for "*all* removal costs incurred by the United States" when undertaking action in accordance with the "National Contingency Plan," as well as "*any* removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." *Id.* §2702(b)(1) (emphases added); 30 C.F.R. §553.702; *see also* 33 U.S.C. §§1321(c)-(e), (*l*). The National Contingency Plan is the "national plan for the removal of oil and hazardous substances from the waters of the United States." *Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 n.1 (5th Cir. 2001); *see* 33 U.S.C. §2701(19). Furthermore, a responsible party is liable for additional damages—including damages to "natural resources"—up to a maximum of "$167.8069 million." 30 C.F.R. §553.702 (emphasis added); *see* 33 U.S.C. §§2702(b)(2)(A), 2704(a)(3), (d)(4).

To ensure that responsible parties can "immediately" access the substantial sums necessary if a liability-triggering incident occurs, H.R. Rep. No. 101-653, at 118 (1990) (Conf. Rep.), the OPA requires them to "establish and maintain evidence of financial responsibility"—*i.e.*, proof that they can promptly pay for at least some removal costs and damages in the event of an incident, 33 U.S.C. §2716(c)(1)(A)—as a condition for operating. That evidence is often referred to as an OSFR. *See* 30 C.F.R. §553.3. As relevant here, responsible parties with at least one offshore facility "located seaward of the seaward boundary of a State" are required to maintain an OSFR in an amount between $35 million and $150 million, with the precise figure determined by the Department of Interior's Bureau of Ocean Energy Management (BOEM), which regulates OSFRs for offshore facilities. 33 U.S.C. §§2716(c)(1)(B)(i), (c)(1)(C).

The OPA contemplates that responsible parties can satisfy the OSFR requirement in various ways, such as through "self-insur[ance]" or by procuring "insurance" from third parties. *Id.* §2716(e); *see also Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 590-

91 (5th Cir. 2011). The person providing the evidence of financial responsibility is known as a "guarantor." 33 U.S.C. §2701(13). If the responsible party chooses the insurance option, the insurance follows the basic norms of the industry: A policy is issued by an insurer to provide the insured (here, a responsible party) with protection against a particular risk (here, a liability-triggering "incident") that may occur during the particular time-period of the coverage. Longstanding regulations implementing the OPA reflect this dynamic. They provide that "[e]ach instrument" that responsible parties "submit as OSFR evidence must specify" the "effective date" and "expiration date" of the policy. 30 C.F.R. §553.41(a)(1). They also state that "termination of the instrument will not affect the liability of the instrument issuer for claims arising from an incident … that occurred on or before the … termination" of the instrument, *id.* §553.41(a)(2), underscoring that guarantors are liable for incidents originating within their date-restricted coverage periods.

When the federal government itself incurs costs when undertaking removal efforts after an incident that results in an oil spill, it can withdraw funds from the Oil Spill Liability Trust Fund, *see* 33 U.S.C. §2712, which is funded by industry payments, *see* 26 U.S.C. §4611(d). As its name implies, the Oil Spill Liability Trust Fund exists specifically to address costs related to oil spills, and its resources are considerable. It currently has approximately $10 billion in assets. *See* Treasury Dep't, Bureau of the Fiscal Serv., *Oil Spill Liability Trust Fund 70X8185 FY 2024 Investment Reporting* (Sept. 30, 2024), https://tinyurl.com/nhd5t427. After financing immediate cleanup efforts via withdrawals from the Oil Spill Liability Trust Fund, the OPA authorizes the government to seek reimbursement from the responsible party. *See* 33 U.S.C. §§2702, 2713(a), 2716(f)(1)-(2).

153557076.1 6

Alternatively, the government may seek reimbursement directly from the responsible party's guarantor under certain circumstances. Specifically, §2716(f) of the OPA says that "a claim for which liability may be established [against a responsible party] under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible party liable under that section for removal costs and damages to which the claim pertains." *Id.* §2716(f)(1). As set forth above, liability is established against a responsible party under §2702 only if there is an "incident" that causes an oil spill, and guarantors provide evidence of financial responsibility during date-restricted periods. Hence, the government may proceed with a §2716(f) claim against the guarantor providing coverage for the period of the "incident"— *i.e.*, if, but only if, the "incident" occurred between the "effective date" and "expiration date" specified in the guarantor's OSFR policy. 30 C.F.R. §553.41(a)(1). And unlike a responsible party, which is on the hook for the whole cost of oil-spill cleanup, a guarantor's derivative liability is limited to the particular amount of financial responsibility that the guarantor provided during the period when the incident occurred. *See* 33 U.S.C. §2716(g).

## B.    Factual Background

Originally constructed in 1984, the MC-20 Facility was an offshore facility located approximately 10 miles off the coast of Louisiana near the mouth of the Mississippi River. *See* Compl. ¶¶1, 31-32, Dkt.1. The New Orleans-based oil company Taylor Energy acquired and began operating the MC-20 Facility in 1994, and by September 2004, "the MC-20 platform was connected to 28 oil and gas wells." *Id.* ¶¶31, 37.

"The 2004 Atlantic hurricane season was a particularly active and destructive season," and "[o]ne of the most destructive Atlantic hurricanes in 2004 was Hurricane Ivan, which swept through the Caribbean, Gulf of Mexico, and southern United States twice between 2 and 24

September."[1]  Nat'l Oceanic and Atmospheric Admin., *An Integrated Assessment of Oil and Gas Release into the Marine Environment at the Former Taylor Energy MC20 Site* 2 (Andrew L. Mason et al. eds., 2019), https://rebrand.ly/kl83oi4 (NOAA Report).  On September 16, 2004, Hurricane Ivan "reached the northern part of the Gulf" with 125-mph winds and 71-foot waves. *Id.*  The hurricane ultimately destroyed seven oil platforms as it headed north, including the MC-20 Facility, which "toppled" as a result of a massive, underwater seafloor collapse.  *Id.*  That event caused "the MC-20 Facility [to] beg[i]n discharging oil into the Gulf of Mexico," with "the first oil sheen report relating to the MC-20 Facility … made to the Coast Guard's National Response Center" on September 17, 2004.  Compl. ¶¶39-40.  This incident is known as the MC-20 Incident.  *See id.* ¶1.

"As the lessee of the MC-20 site, Taylor was designated … as 'the responsible party' under OPA for removal costs and damages." *QBE Underwriting Ltd. v. Taylor Energy Co., LLC*, 2023 WL 7280522, at *1 (E.D. La. Nov. 3, 2023); *see* Compl. ¶1.  At the time of the MC-20 Incident, and in full compliance with then-applicable requirements, Taylor Energy maintained an insurance policy that provided $35 million in OPA coverage, and that amount (along with over $100 million in other coverage) "was paid" in full by the insurers responsible for the time of the incident and used for removal efforts associated with the incident. *Taylor Energy Co. LLC v. Underwriters at Lloyd's*, 2010 WL 4553482, at *4 (E.D. La. Oct. 29, 2010).  In addition, Taylor Energy deposited approximately $666 million into a trust to decommission the MC-20 Facility (Decommissioning Trust), *see* Compl. ¶46, and between 2004 and 2018, it contributed hundreds of millions of dollars

---

[1] The President recently renamed the Gulf of Mexico as the Gulf of America. *See* Exec. Order No. 14,172 (Jan. 20, 2025).  Because the government's complaint uses the name Gulf of Mexico, this brief does the same for consistency.

of its own money toward additional removal costs, *see Taylor Energy Co. LLC v. United States*, 2020 WL 6075693, at \*2 (D.D.C. Oct. 14, 2020).

In October 2018, the Washington Post published an article criticizing the government for its response to the MC-20 Incident and suggesting—based on non-peer-reviewed research—that oil continued to spill from the MC-20 platform in significant quantities. *See* Darryl Fears, *A 14-Year-Long Oil Spill in the Gulf of Mexico Verges on Becoming One of the Worst in U.S. History*, Wash. Post (Oct. 21, 2018), https://rebrand.ly/9iaq7qf. Soon thereafter, in November 2018, the government "assumed authority for containing the MC-20 Incident" and allegedly incurred approximately $43 million in removal costs over the next four years. Compl. ¶¶66, 69. The government obtained those funds from the Oil Spill Liability Trust Fund. *See id.* ¶69.

In October 2020, the government sued Taylor Energy for reimbursement of those removal costs. *See id.*; *United States v. Taylor Energy Co. LLC*, No. 20-cv-2910 (E.D. La. filed October 23, 2020). In the end, the parties resolved their dispute through a consent decree, which the district court approved. *See* Consent Decree, *Taylor Energy Co. LLC*, No. 20-cv-2910 (E.D. La. filed Mar. 17, 2022), Dkt.153. Among other things, the consent decree required Taylor Energy to pay the government $43.5 million, and the parties designated approximately $13 million of that amount as a partial reimbursement for the government's removal costs and another $16.5 million for damages related to natural resources. *See id.* ¶29. The consent decree further stated that Taylor Energy would transfer the $432 million remaining in the Decommissioning Trust to the government; that Taylor Energy would transfer $1.1 million in excess "surety" funds to the government; and that Taylor Energy "will liquidate all non-liquid assets and will pay to the United States the proceeds of such liquidation." *Id.* ¶¶8, 10, 38, 40; *see* Compl. ¶71. And the consent decree released Taylor Energy from any further OPA liability related to the MC-20 Incident. *See* Consent Decree ¶57.

The consent decree also stated that it "does not limit or affect the rights of … the United States … against any third parties, not party to this Consent Decree," *id.* ¶63—language that (according to the government) allows it to pursue claims against Taylor Energy's guarantors, which are not mentioned in the consent decree, *see* Compl. ¶72.

Meanwhile, the government continued to tap the Oil Spill Liability Trust Fund as it incurred additional removal costs. All told, the government's tab ballooned to over $128 million by the second half of 2023—and has only continued to grow. *See* Compl. ¶¶73, 100. Now, having released Taylor Energy, the government has set its sights on Taylor Energy's guarantors. But, as noted, the government could not seek reimbursement from Taylor Energy's 2004 insurer, because it had already paid out all OPA coverage in full. *See* p.8, *supra.* Instead, invoking a theory of liability that it had never previously asserted in the history of the OPA, the government targeted guarantors (including Underwriters here) that issued OSFRs in the years *after* the MC-20 Incident—specifically, guarantors that provided evidence of financial responsibility for Taylor Energy between 2005 and 2021. *See* Compl. ¶¶77-90, 94-104. When those post-2004 guarantors refused to pay based on the plain text of the OPA, basic principles of insurance coverage, and commonsense principles of chronology, *see id.* ¶105, the government filed this lawsuit on November 26, 2024.

## SUMMARY OF ARGUMENT

The government's overreaching lawsuit against Underwriters is fatally flawed and cannot proceed. Most obviously, the government's theory of liability is squarely foreclosed by the OPA. Although §2716(f) of the OPA authorizes the government to seek reimbursement from a guarantor that provided OPA coverage and issued an OSFR at the time of a liability-triggering "incident," it decidedly does not authorize the government to obtain recovery from guarantors that provided OPA coverage long after the incident occurred. The OPA's plain text confirms as much, as do

153557076.1  10

foundational principles of insurance law, the background that Congress legislated against when enacting the OPA. Longstanding regulations implementing the OPA only reinforce the point, as they require OSFRs to have "effective dates" and "expiration dates" precisely because guarantors are liable only for incidents that occur within the stated window of coverage.

Those principles make this an exceedingly straightforward case: Because the MC-20 Incident occurred in 2004, and because this case involves post-2004 OSFRs, the government is legally prohibited from obtaining any recovery from Underwriters. The government arrives at the contrary conclusion only by rendering language in the OPA superfluous and ignoring precedent rejecting its theory of liability. The government's arguments could not have prevailed even in *Chevron*'s heyday, and are weaker still today. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("*Chevron* is overruled."). Moreover, the government's shortsighted effort at recovery is a blueprint to destroy the market for OPA coverage, and without that market, the oil industry is likely to come to a halt. None of this is what Congress envisioned. And needless to say, there is no shirking of responsibility here. The government and Taylor Energy got what they bargained for—immediate funds in the immediate wake of an oil spill—and the guarantors responsible for the year of the incident have paid in full. But this effort to distort the statute and basic principles of insurance to make year after year of guarantors pay for incidents that predated their years of coverage has nothing to recommend it.

While this Court need not proceed any further, the government's consent decree with Taylor Energy independently forecloses this lawsuit. As a result of that consent decree, which released the government's claims against Taylor Energy, the government is precluded from obtaining any recovery from Taylor Energy's guarantors under the OPA. In addition, the consent decree resulted in the transfer of hundreds of millions of dollars, including a $432 million trust,

from Taylor Energy to the government, and allowing the government to recover more money from Taylor Energy's guarantors at this juncture would amount to an impermissible double recovery.

In short, the government is demanding money from entities that owe it nothing—all based on claims that it has already released. The Court should promptly dismiss the complaint with prejudice.

## LEGAL STANDARD

In reviewing a motion to dismiss, a court's task is to determine whether the complaint states "a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In conducting that inquiry, the court must "accept all well-pleaded facts as true and construe the facts in the light most favorable to the non-movant." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022). But the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). In deciding the motion, moreover, this Court may consider not only the complaint and documents referenced in it, but also "matters of public record." *Akula v. Cassidy*, 2024 WL 1556534, at *2 (E.D. La. Apr. 10, 2024) (Papillion, J.).

## ARGUMENT

I.     **The Oil Pollution Act Does Not Authorize The Government To Obtain Any Recovery From Underwriters Related To The MC-20 Incident.**

     A.     **Underwriters Were Not The Guarantors That Provided Evidence of Financial Responsibility for Taylor Energy at the Time of the MC-20 Incident.**

The government is invoking §2716(f) of the OPA to demand reimbursement from Underwriters for $128 million in removal costs (and evidently intends to invoke that provision to seek reimbursement for even more removal costs and damages in the future). *See* Compl. ¶¶3-4. In relevant part, §2716(f) states that "a claim for which liability may be established under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial

responsibility for a responsible party liable under that section for removal costs and damages to which the claim pertains." 33 U.S.C. §2716(f)(1). As that text makes clear, a guarantor's liability under §2716(f) hinges on a responsible party's liability under §2702. Section 2702, in turn, provides that "each responsible party for … a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, … is liable for the removal costs and damages specified in subsection (b) that result from such *incident*." *Id.* §2702(a) (emphasis added); *see also id.* §2702(b) (discussing removal costs and damages). A responsible party thus is liable under §2702 only in the event of an "incident," *id.* §2702(a), and "incident" is a defined term that focuses on a particular point in time. Specifically, "'incident' means any occurrence or series of occurrences having the same origin, involving one or more … facilities … , resulting in the discharge or substantial threat of discharge of oil." *Id.* §2701(14). As courts have thus explained, "[t]he 'incident'" that triggers a responsible party's liability under §2702 "is what *caused* the [oil] spill" in the first place. *Water Quality Ins. Syndicate v. United States*, 522 F.Supp.2d 220, 229 (D.D.C. 2007) (emphasis added).

That statutory scheme thus makes clear that guarantors "providing evidence of financial responsibility"—*i.e.*, OSFRs—at the time of the "incident" that renders the responsible party "liable" under §2702 are subject to direct claims under §2716(f). But those that provide guarantees for later years are responsible for "incidents" during those later years, not incidents that occurred before they issued the guarantees. If a driver gets into a car accident, all would agree that the insurer providing car insurance at the time of the accident is on the hook, and not the insurer that covered later years (and later accidents, if any). The same is true under the OPA. The OPA does not authorize the government to proceed with a claim under §2716(f) against a guarantor providing OPA coverage during a period when no "incident" occurred. During that period, the responsible

153557076.1  13

party is not "liable" under §2702—and hence the guarantor is not "providing evidence of financial responsibility for a responsible party liable under that section." 33 U.S.C. §2716(f)(1). Nor can the government pursue a claim under §2716(f) against a guarantor based on a *previous* incident that arose during a *different* guarantor's coverage period. That follows from the plain text of the OPA. Under the OPA, a guarantor supplies evidence of financial responsibility to a party responsible for an offshore facility for the purpose of mitigating the "*risks*" associated with the "worst-case oil spill discharge *potential*" of the facility. *Id.* §2716(c)(1)(A)(iii) (emphases added). The word "risk" means "the element of uncertainty in an undertaking," and the word "potential" means "[e]xisting in possibility" but "not now existing." *Risk, Potential*, Black's Law Dictionary (6th ed. 1990). Guarantors thus are on the hook for *possible* events that *may* arise during their coverage periods—*viz.*, the occurrence of "incidents"—not for events that already came to pass beforehand.

That understanding of the OPA is consistent with basic principles of insurance law. Insurance against liabilities already incurred or accidents that have already occurred is an oxymoron. "It is a simple axiom of insurance law that 'a risk covered by a policy of liability insurance is not covered if it occurs either before or after the period of coverage under the policy.'" *Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415, 417 (7th Cir. 1993). Relatedly, the "loss-in-progress" doctrine provides that "[a]n insured cannot insure against something that has already begun and which is known to have begun." *Franklin v. Fugro-McClelland (Sw.), Inc.*, 16 F.Supp.2d 732, 735 (S.D. Tex. 1997). That is because the concept of "fortuity" (or "risk" or "potential") is at the heart of insurance. *See BITCO Gen. Ins. Corp. v. Acadia Ins. Co.*, 427 F.Supp.3d 838, 856 (E.D. Tex. 2019). Indeed, "[b]ecause insurance policies … are designed to insure against fortuities, a fraud is worked when they are misused to insure a

certainty." *Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.*, 997 F.2d 172, 197 (6th Cir. 1993).

The OPA embodies these common-law principles. "It is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Sekhar v. United States*, 570 U.S. 729, 732 (2013); *cf. Mason Drug Co., Inc. v. Harris*, 597 F.2d 886, 887 (5th Cir. 1979), and the OPA's provisions addressing guarantors and financial responsibility draw an explicit textual connection to the concept of "insurance," 33 U.S.C. §2716(e). So, too, do longstanding regulations implementing the OPA. *See* 30 C.F.R. §§553.20(b), 553.29. In fact, the "Form 1019s" that the government references in its complaint to prove that Underwriters provided OSFRs to Taylor Energy, *see* Compl. ¶91, are known as "insurance certificates," 30 C.F.R. §553.29(b)(2). It is thus fair to presume that, in enacting the OPA, Congress did not intend to abandon bedrock principles of insurance law by imposing liability on guarantors for events that came before (or after) their OSFR periods. While Congress is of course free to depart from such background principles in legislation, it needs to "speak directly" to the issue when doing so. *United States v. Texas*, 507 U.S. 529, 534 (1993). But the OPA contains no evidence that Congress did so here. The "best" reading of the OPA, then, is that the government may invoke §2716(f) to recover against *only* those guarantors providing OSFRs at the time of a liability-triggering incident. *Loper Bright*, 603 U.S. at 400.

BOEM regulations could not lawfully deviate from that statutory text, but they are in fact fully consistent with that reading. Those regulations expressly recognize that an OSFR is date-restricted and "must specify" an "effective date" and "expiration date" so that it is clear to the government which insurer is providing evidence of financial responsibility when. 30 C.F.R. §553.41(a)(1). It would make no sense if the government could pursue a §2716(f) claim against a

153557076.1 15

guarantor providing evidence of financial responsibility during a particular period even if that claim pertains to an incident that did not even occur within that coverage period. That would render superfluous the government's own regulations requiring OSFRs to contain effective dates and termination dates, which have existed for decades. *See, e.g.*, 63 Fed. Reg. 42,699, 42,716 (Aug. 11, 1998); 33 C.F.R. §135.207(c) (1990). Elementary principles of textual interpretation foreclose such anomalous results. *See, e.g., Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant" or "mere surplusage[.]").

And it is unsurprising that the regulations, like the OPA itself, hold guarantors liable only if "incidents" occurred during their OSFR periods given Congress' objectives in this area. The primary purpose of the OPA's financial-responsibility requirement is "to ensure that there will be adequate funds *immediately* available to compensate injured parties" as soon as incidents occur. H.R. Rep. No. 101-653, at 118 (emphasis added); *see CITGO Asphalt Ref. Co.*, 589 U.S. at 353 (explaining that Congress passed the OPA "to promote the *prompt* cleanup of oil spills" (emphasis added)). That purpose is furthered by a system that allows the government to recover against the guarantor providing evidence of financial responsibility at the time of the injury-creating incident—not by a system that allows non-immediate recovery against guarantors providing OPA coverage in multiple subsequent years after incidents.[2]

---

[2] It bears emphasizing that other accepted forms of evidence of financial responsibility—like self-insurance—would not allow the government to "stack" its recovery and collect year after year. That dynamic underscores the absurdity of allowing the government to draw on multiple OSFRs from multiple insurers providing OPA coverage over multiple years. In reality, the government may collect only from insurers providing OSFRs at the time of "incident[s]"—and that is because the OPA is designed to facilitate "prompt" responses to oil spills. *CITGO Asphalt Ref. Co.*, 589 U.S. at 353.

More fundamentally, if the statute is to work as intended and insurance proceeds are to reach those in need in the immediate aftermath of an incident, a "market for guarantors" must actually exist. 61 Fed. Reg. 9,264, 9,272 (Mar. 7, 1996). Quite obviously, however, a regime in which insurers are required to pay for catastrophic events that occurred *before* their coverage periods is a recipe to destroy that market. No insurer is going to insure the "incident" that already happened—just as no insurer is going to insure a house already on fire. And if no insurers are willing to provide OPA coverage, it is hard to imagine how the oil industry can survive, as OSFRs are something that offshore facilities and vessels *must* maintain under the OPA to continue operating. *See* 33 U.S.C. §2716. Here, for example, Taylor Energy needed OSFRs to cover its post-incident operations at other facilities. *See id.* §2716(c)(1)(D). If the market had understood that the cost of providing those necessary guarantees would be to pay for the ongoing costs of an incident that had already occurred, no one would have provided coverage.

To be sure, acknowledging that Congress authorized the government to proceed with §2716(f) claims against only those guarantors providing OPA coverage at the time of the liability-triggering incidents entails acknowledging the possibility that cleanup costs will exceed the amount of the guarantees (or even the total value of the responsible enterprise, plus the amount of the guarantee). But that simply reflects the statutory reality that responsible parties are only required to obtain OSFRs reflecting a determined amount of OPA coverage, not unlimited coverage, for any period in which they operate facilities. *See, e.g., id.* §2716(c)(1)(C) (requiring offshore facilities to have, at most, $150 million in OPA coverage). The statute sets the amount of coverage that must be in place at any one period of time and does not vary based on how many years a responsible party has been operating. Here, for example, Taylor Energy needed $35 million to operate in 2004, it did not need more or less based on how many years that it had been operating

or would operate in the future (and thus how many guarantors for other periods the government could try to target). Congress deemed $35 million sufficient (not hundreds of millions of dollars).

Congress likewise specifically provided for situations when cleanup costs outstrip the amount of the required OSFRs. Responsible parties are always responsible for paying for removal costs and damages as long as they have funds available—as Taylor Energy's example vividly illustrates. And the Oil Spill Liability Trust Fund is available as a further backstop: "The Oil Spill Liability Trust Fund ... is available to pay for uncompensated removal costs and damages." *Rick Franklin Corp. v. DHS*, 2008 WL 337978, at *4 (D. Or. Feb. 4, 2008) (citing 33 U.S.C. §§2712(a)(4), 2713)). That fund, moreover, is hardly running dry: Its assets are approaching $10 billion, and new funds regularly come in through taxes on crude oil and petroleum products. *See* 26 U.S.C. §4611. In short, all tools of statutory interpretation confirm that the government may seek reimbursement from a guarantor only if that guarantor provided an OSFR at the time of an OPA-liability-triggering "incident."

Once that much is established, the government's complaint collapses. As the first paragraph of the complaint explains, this "case arises from an occurrence or series of occurrences beginning on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico and an offshore oil production platform located approximately ten miles off the coast of the State of Louisiana on the Outer Continental Shelf, owned and operated by Taylor Energy Company LLC ('Taylor Energy'), collapsed and sank, resulting in the discharge or substantial threat of discharge of oil, which continues to this day ('MC-20 Incident')." Compl. ¶1. In other words, this case arises from an "incident"—the MC-20 Incident—from September 2004.

That being so, the government has a claim under §2716(f) (if at all) only against Taylor Energy's guarantor in September 2004. As already explained, however, that guarantor is not even

153557076.1 18

a party in this case—presumably because it already paid everything owed under its 2004 OPA coverage. *See Taylor Energy*, 2010 WL 4553482, at *4. Instead, the government is trying to squeeze hundreds of millions of dollars from guarantors (including Underwriters) that provided OPA coverage for Taylor Energy in the years *after* the MC-20 Incident—namely, between September 2005 and January 2021. *See* Compl. ¶¶77-90. The OPA does not tolerate such avarice. Simply put, because Underwriters did not "provid[e] evidence of financial responsibility" to Taylor Energy at the time of the "incident" that made Taylor Energy "liable," the government cannot obtain reimbursement from Underwriters for removal costs and damages arising from that incident. 33 U.S.C. §2716(f).

### B.    The Government's Theory of Guarantor Liability Is Meritless.

The government's complaint accepts the premise that it is authorized to proceed with a direct claim against a guarantor under §2716(f) only if an "incident" took place during that guarantor's OSFR period. And although the government acknowledges that the MC-20 Incident "began on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico," Compl. ¶117, it considers that 2004 date no obstacle to its efforts to collect against post-2004 guarantors because it interprets the "incident" here to encompass not only Hurricane Ivan, but *also* "Taylor Energy's [ongoing] failure to effectively decommission the MC-20 Facility wells or otherwise stop the ongoing discharges of oil or substantial threat thereof." *Id.* That "tortured reading of the statute's definition of 'incident'" has not carried the day before, *Golnay Barge Co., Inc. v. M/T SHINOUSSA*, 3 F.3d 439 (5th Cir. 1993) (per curiam) (unpublished), and it fares no better now.

The fundamental problem with the government's theory of liability is that it conflates two materially different concepts in the statute—"incidents" and "discharges"—and "is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is

153557076.1  19

given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation marks and alterations omitted). The OPA defines an "incident" as the "occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, *resulting in* the *discharge* or substantial threat of *discharge* of oil." 33 U.S.C. §2701(14) (emphasis added). And the OPA *separately* defines "discharge" to include the "spilling" of oil. *Id.* §2701(7). As courts thus have admonished other litigants, "[t]he 'incident,' therefore, is *not* the oil spill" (which is the discharge); instead, "[u]nder the plain language of the statute, the incident is what caused the spill." *Water Quality Ins. Syndicate*, 522 F.Supp.2d at 229 (emphasis added). The "incident" thus plainly occurred in 2004, and any later discharges of oil date back to that incident.

The government nevertheless believes that it may forge ahead with its novel theory of an-incident-that-never-ends because the OPA's definition of "incident" uses the phrase "occurrence or *series of occurrences* having the same origin," 33 U.S.C. §2701(14) (emphasis added), and the "series of occurrences" language purportedly encompasses the daily failure to stop the oil spill at the MC-20 site. *See* Compl. ¶¶1, 117. That submission is deeply flawed. The statute refers to a "series of occurrences having the same origin" in an effort to group multiple related occurrences to a single "incident." To try to use that language to convert a single incident and its ongoing consequences into multiple discrete incidents gets matters almost exactly backwards. Moreover, any failure by Taylor Energy to decommission the wells or stop the discharge is not an occurrence at all, but its virtual opposite—a *non*-occurrence. The failure to respond adequately to an incident, however, is not itself an incident under the statute.

For all these reasons, courts have already concluded that the "daily" "spread of oil throughout the [water] does *not* constitute a series of occurrences within the meaning of the

statute." *Golnay Barge*, 3 F.3d at 439 (emphasis added). And for good reason, as the OPA's "series of occurrences" language plainly refers to circumstances where multiple closely linked events combine together to cause an oil spill. For example, if an oil platform collapses because a series of small underwater mudslides, rather than a single large mudslide, that series of mudslide occurrences would still constitute a single "incident" for OPA purposes. But that does the government no favors here, as the government understands "incidents" to include what happened long *after* the occurrences that caused the oil spill. The OPA offers exactly zero support for that theory. Indeed, if the government had the right reading of the statute, guarantors would avoid continuous liability only in the exceedingly rare circumstance where an oil spill begins and ends within a single OSFR period. And in the far more likely scenario where discharges continue into other OSFR periods, any guarantor brave enough to issue an OSFR during those later periods would do so only on the condition that responsible parties pay premiums equal to the full amount of the guarantors' OPA liability, as anything less would likely cause guarantors to go into the red. The government's theory "sounds absurd, because it is." *Sekhar*, 570 U.S. at 738.

The problems for the government do not end there, as its theory of liability is also hopelessly inconsistent with the loss-in-progress doctrine. The government does not disagree. Instead, the government seems to think that its regulations affirmatively *require* it to violate that doctrine, since they state that "termination of the instrument will not affect the liability of the instrument issuer for claims arising from an incident … that occurred on or before the effective date of termination." Compl. ¶¶26, 92 (citing 30 C.F.R. §553.41(a)). But that regulation is obviously not putting the guarantor on the hook for pre-coverage incidents that are already in progress. It is simply reaffirming the intuitive point that, while termination of the OSFR prevents guarantors from accruing *new* liability after its expiration, termination does not absolve them of

*old* liability that accrued during the effective period of their OSFRs. *See* 30 C.F.R. §553.41(a)(3) ("Each instrument you submit as OSFR evidence must specify[] ... [t]hat the instrument will remain in force until the termination date[.]"). The regulation emphasized by the government thus just reinforces that guarantor liability is specific to a particular time period—as the regulatory provision discussing the "effective date" and "expiration date" of the OSFR only underscores. *See* 30 C.F.R. §553.41(a)(1). Tellingly, the government's complaint does not even mention the latter regulatory provision, *see* Compl. ¶26—even though it comes immediately before the regulation that the government cites. The government's complaint thus makes crystal clear that its theory of liability would render its own regulations superfluous and depart from basic insurance-law principles. That theory has nothing to recommend it.

*    *    *

In sum, the OPA authorizes the government to proceed with direct claims against guarantors only if "incidents" occurred during the guarantors' respective OSFR periods. The MC-20 Incident in 2004 did not occur within Underwriters' post-2004 coverage periods. The government thus may not recover any money from Underwriters in this lawsuit.

## II.    The Government's Consent Decree With Taylor Energy Precludes The Government From Obtaining A Double Recovery From Post-2004 Guarantors.

Even if the government had a legally valid theory of liability that allowed it pursue claims against post-2004 guarantors in relation to the MC-20 Incident (it does not), its complaint would still fail as a result of its consent decree with Taylor Energy. As discussed, §2702 of the OPA allows the government to recover against the responsible party in the event of a liability-triggering incident, 33 U.S.C. §2702(a), while §2716(f) allows the government to recover directly against the responsible party's guarantor if "a claim for ... liability may be established under section 2702," *id.* §2716(f). As those provisions make plain, a guarantor's liability under the OPA is entirely

derivative of the responsible party's liability.  As a result, if there is no liability against a responsible party, there is no liability against the guarantor either.  Here, the government sued Taylor Energy (the responsible party), and it ultimately released its claims against that entity.  *See* pp.9-10, *supra*.  The upshot is that the government is now statutorily precluded from seeking recovery against Taylor Energy's post-2004 guarantors.  Indeed, given the consent decree, there is simply no "claim for which liability may be established under section 2702" against the principal anymore, which is a prerequisite for a §2716(f) claim against a guarantor.  33 U.S.C. §2716(f).

Nor is it even clear why the government is seeking additional money from the post-2004 guarantors anyway.  The government is asking the Court to compel Underwriters and the other post-2004 guarantors to reimburse it for $128 million in already-incurred removal costs while suggesting that it will need even more money to pay for future removal costs and damages.  Compl. ¶¶73-76.  But the government's request ignores that, in exchange for a release of liability, among other payments, Taylor Energy transferred control over a $432 million trust to the government.  The government is allowed to use every dime in that trust not used for "decommissioning activities (including soil remediation)"[3] to pay for other "removal costs relating to the MC-20 Incident or the costs of assessing NRD [Natural Resource Damages] or restoring, replacing, rehabilitating, or acquiring the equivalent of Natural Resources (including natural resource services) injured, lost, or destroyed as a result of the MC-20 Incident, or the costs of planning and monitoring such restoration activities." Consent Decree ¶¶10, 16.  The government's complaint does not allege that it has already managed to exhaust all $432 million in the Decommissioning Trust.  As long as any funds remain in that trust, any additional recovery from Taylor Energy's guarantors constitutes an

---

[3] Costs related to decommissioning activities also qualify as "removal costs" under the OPA. *See* 33 U.S.C. §2701(31) (defining "removal costs" to include "costs to prevent, minimize, or mitigate oil pollution" from ongoing discharges).

impermissible double recovery.[4] *See, e.g., Lowery v. Fid. Nat'l Prop. & Cas. Ins. Co.,* 805 F.3d 204, 205 (5th Cir. 2010); *see also* Douglas Laycock & Richard L. Hasen, *Modern American Remedies* 17 (5th ed. 2019) (a "plaintiff cannot recover the same item of damage more than once"; "[I]f plaintiff collects a judgment from one defendant, he cannot collect it again from any other."); Restatement (Second) of Judgments §50 cmt. c (1982) ("A payment by one person liable for a loss reduces pro tanto the amount that the injured person is entitled to receive from other persons liable for the loss."). Congress did not envision the OPA as a device for the government to obtain windfalls—much less windfalls from guarantors that did not even provide OPA coverage at the time of the relevant incident.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the government's claims against Underwriters with prejudice.

---

[4] The $432 million in the Decommissioning Trust would suffice to reimburse (1) the government's request for $128 million in already-incurred removal costs, (2) $168 million in natural-resources damages, which is the statutory maximum, *see* 33 U.S.C. §2702(b)(2)(A), 2704(a)(3); 30 C.F.R. §553.702, and (3) $136 million in *additional* removal costs.

Respectfully submitted,

PAUL D. CLEMENT, VA Bar #37915
 (pro hac vice pending)
ANDREW C. LAWRENCE, VA Bar #99830
 (pro hac vice pending)
NICCOLO A. BELTRAMO*, DC Bar #9008526
 (pro hac vice pending)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm
who are members of the Virginia bar

s/Jennifer E. Michel
JENNIFER E. MICHEL, LA Bar #18114
LEWIS BRISBOIS BISGAARD
& SMITH LLP
100 East Vermillion Street
Suite 300
Lafayette, LA 70501
(337) 205-4739
jenny.michel@lewisbrisbois.com

MARY K. DENNARD, LA Bar #18285
SUSAN G. KELLER-GARCIA, LA Bar #30574
LEWIS BRISBOIS BISGAARD
& SMITH LLP
400 Poydras Street
Suite 1300
New Orleans, LA 70501
(504) 264-9286
malise.dennard@lewisbrisbois.com
susan.kellergarcia@lewisbrisbois.com

JANE C. LUXTON, DC Bar #243964
(pro hac vice pending)
GEORGE LEAHY, DC Bar #90017502
(pro hac vice pending)
LEWIS BRISBOIS BISGAARD
& SMITH LLP
2112 Pennsylvania Ave NW
Suite 500
Washington, D.C. 20037
(202) 558-0659
jane.luxton@lewisbrisbois.com
george.leahy@lewisbrisbois.com

*Counsel for Defendants, certain Underwriters, as identified in the Motion to Dismiss*

February 28, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Jennifer E. Michel
Jennifer E. Michel

153557076.1